UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHAYA WIEDER, | |
| Plaintiff, | |
| -against- | |
| GREATER HUDSON VALLEY SYSTEM (n/k/a GARNET HEALTH), ORANGE REGIONAL MEDICAL CENTER, and ERICA BURGOS | |
| Defendants, | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/13/2024__

21-cv-8026 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Chaya Wieder ("Plaintiff") initiated this action on September 27, 2021, alleging violations of Section 1981 ("Section 1981") of the Civil Rights Act and Title VII of the Civil Rights Act of 1964 ("Title VII") against Defendants Garnet Health f/k/a Greater Hudson Valley System ("Garnet Health"), Garnet Health Medical Center f/k/a Orange Regional Medical Center ("GHMC"), and Erica Burgos ("Burgos") (all together, the "Defendants").

Presently before the Court is the Defendants' Motion for Summary Judgment pursuant to Federal Rules of Civil Procedure 56. For the following reasons, the Defendants' Motion for Summary Judgment is GRANTED.

## BACKGROUND

Defendants submitted a brief, a statement of material fact pursuant to Local Rule 56.1, and the record and exhibits from discovery in the instant proceeding, which reflect the following factual background. Plaintiff, represented by Counsel, chose to submit neither a Rule 56.1 statement nor a counterstatement to Defendants' Rule 56.1 statement. A "nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude the facts asserted in the statement

1

are uncontested and admissible . . . [i]n the typical case, failure to respond results in a grant of summary judgment once the court assures itself that Rule 56's other requirements have been met." *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417-418 (2d Cir. 2009); *see also Gubitosi v. Kapica,* 154 F.3d 30, Note 1 (2d Cir. 1998); *Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 18 (2d Cir. 2015). Therefore, the following uncontested and admitted facts are derived from the record and Defendants' unopposed Rule 56.1 statement, as supported by evidence in the record.

Plaintiff, an Ultra-Orthodox Hasidic woman, was hired as a full-time, hourly Inpatient Coder at GHMC in April 2017. (Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Defs.' 56.1") ¶ 12, ECF No. 68.) As part of her hiring, Plaintiff signed a Remote Access Policy agreement wherein GMHC stated that "[r]emote connection to [the] network may be monitored to record dates, times, duration of access, etc. in order to identify unusual usage patterns or other suspicious activity." (Defs' 56.1 ¶ 2.) GHMC maintains a Standard of Performance and Behavior Policy which detailed violations that could serve as the basis of immediate discharge, such as "[t]heft, misappropriation, unauthorized possession or use of property belonging to the Hospital, patient, visitor or theft of time." (*Id*. ¶ 1.) GHMC also maintains a Punctuality Policy which stipulates that "[e]mployee punctuality is essential in the delivery of quality healthcare and customer service." (*Id*. ¶ 5.) Plaintiff acknowledged receipt of all of GHMC's employment policies and standards at the outset of her employment with GHMC. (*Id*. ¶ 28.)

During the interview process, Plaintiff was interviewed by Rachel Roeber ("Roeber"), Erica Burgos ("Burgos"), and Monica Tyiska ("Tyiska"). (*Id*. ¶ 8.) Plaintiff expressed the need to observe Jewish holidays but did not specify which dates she would want to take off during the interview. (*Id*. ¶ 9.) Plaintiff further expressed during the interview her desire to work remotely and have a flexible schedule; Roeber advised Plaintiff that a flexible working schedule might be

possible, but that GHMC would need Plaintiff to communicate with Clinical Data Integration ("CDI") during certain hours of the day. (*Id* ¶ 10.) Neither Roeber, Tyiska nor Burgos expressed any concerns or hesitancy to hire Plaintiff due to her need for flexibility, remote work, and observance of Jewish holidays. (*Id*. ¶ 11.)

Plaintiff was specifically hired as a full-time, hourly Inpatient Coder at GHMC, scheduled to work seventy-five hours. (*Id*. ¶¶ 12-12.) Plaintiff's responsibilities included coding inpatient charts, working within platforms EPIC and Chartwise. (*Id*. ¶¶ 14, 136.)  Plaintiff would use API, GHMC's timecard system, to clock time in and out of work. (*Id*. ¶ 16.) Plaintiff's immediate supervisor was Tyiska, who then reported to Roeber and Burgos. (*Id*. ¶¶ 17-18.) Burgos' title was Operations Manager, Documentation and Coding, and did not supervise Plaintiff. (*Id*. ¶¶ 19-20). After Tyiska left GHMC, Maryann Malamas ("Malamas") became Plaintiff's supervisor. (*Id*. ¶ 21.)

When Plaintiff started working at GHMC, she was required to be on site for several weeks prior to being able to phase into the pilot remote program. (*Id*. ¶ 23.) As the option of remote work was a pilot program, the terms of the program were subject to change depending on GHMC's experience with the program. (*Id*. ¶ 25.) Plaintiff requested and was provided flexibility as to when she was required to work on site. (*Id*. ¶ 26.) Plaintiff was still required to be on site once a week even when she transitioned to remote work. (*Id*. ¶ 27.)

After being hired, Plaintiff spoke to Tyiska, Roeber, and Burgos regarding paid time off (PTO) request. (*Id*. ¶ 29.) Then, on April 26, 2017, Plaintiff emailed Tyiska to discuss matters concerning time off with the Human Resources department, including her request to take off approximately twenty-nine days as unpaid time off in 2017. (*Id*. ¶ 30.) Plaintiff stated that she preferred to take holidays as unpaid time off because she did not want to use up her sick time or

vacation time. (*Id.* ¶ 31.) Prior to her email, Plaintiff had a conversation with Tyiska regarding what was discussed during her interview, at which point Tyiska directed Plaintiff to elucidate her time off requests in an email that could be shared with the Human Resources department. (*Id.* ¶ 32.) After receiving Plaintiff's email regarding her time off requests, Mary Jo Levins ("Levins") responded to Roeber, stating that dates Plaintiff requested off before being hired should be honored, and that Roeber was to explain to Plaintiff that she needs to request time off in accordance with department practice and that she must have accruals in place to support her requested time off, in accordance with the company's PTO policy. (*Id.* ¶ 34.)

Thereafter, Burgos emailed Rosemary Baczewski ("Baczewski"), Levins, Roeber and Tyiska regarding her conversation with Roeber and Tyiska, stating in summary that Plaintiff was expected to work at least 7.5 hours a day Monday through Thursday, that they would honor a flexible schedule for Plaintiff, despite not being the "norm," and flagged that a possible consideration could be that Plaintiff be converted to a per diem employee. (*Id.* ¶ 36.) Afterwards, Burgos and Tyiska sent a memorandum to Plaintiff, detailing that while Plaintiff was entitled to twenty days of paid off time, GHMC could not accommodate Plaintiff's request for unpaid time or additional time off above the twenty-day maximum PTO accrual as it was not GHMC's practice. (*Id.* ¶¶ 37-40.)

In an effort to accommodate Plaintiff, GHMC proposed three options to Plaintiff: 1) that she change her status to per diem; 2) that she change her position from full time to part time status; 3) remain as a full time employee with flexibility regarding working days. (*Id.* ¶ 41.) After considering her options, Plaintiff sent an email to Burgos, Tyiska, Roeber, and Lauren Carberry ("Carberry"), electing to change to per diem status, expressing her gratitude and appreciation for being able to switch to a per diem status. (*Id.* ¶ 49.)

Plaintiff states at some point in a conversation in 2017 that either Levins or someone from the Human Resources Department told Plaintiff, when discussing scheduling around Jewish holidays, "the Muslims can make it work, why can't you?" (*Id*. ¶ 62.)

On August 2, 2019, Plaintiff sent Angela Lane ("Lane") an email regarding her request for a pay increase, to which Lane replied that she was meeting with the Human Resources Department on August 8, 2019 and would raise the issue then. (*Id*. ¶¶ 72-73.) Then, on August 9, 2019, Lane emailed Plaintiff advising her that she would receive a pay increase, but that there would not be any retroactive payment in response to the future increase. (*Id*. ¶ 73.) Plaintiff responded stating that she was disappointed and would potentially file a complaint with the New York State Department of Labor, but states that she does not recall whether she indeed filed any complaint. (*Id*. ¶ 76.)

To assess the productivity of a coder, managers, such as Malamas would review how many charts the coder completed on a given day or week. (*Id*. ¶ 88.) On September 23, 2019, Malamas emailed Levins, Roeber and Burgos regarding her finding that on September 19, 2019, Plaintiff had clocked in at 7:47 A.M. but did not complete any charts. (*Id* ¶ 105.) Malamas also checked the following morning of September 20, 2019, and saw that Plaintiff clocked out at 5:42 PM on September 19, 2019, but could not account for the work purportedly done when reviewing productivity reports. (*Id*. ¶ 106.)

Plaintiff was scheduled to work at least half a day on Sunday, September 22, 2019, as she worked a half day Friday, September 20, 2019. (*Id*. ¶ 108.) On September 23, 2019, while reviewing Plaintiff's work for Sunday, Malamas noticed that Plaintiff clocked in at 7:51 A.M. but was not active on any accounts and her activity status was shown as "away." (*Id*. ¶ 109.) Malamas then called Plaintiff to inquire as to what Plaintiff was working on, to which Plaintiff advised

Malamas that she had not actually started working yet, but clocked in already so that she could complete her hours for the day without going past 6:00 P.M. (*Id*. ¶ 110.) Malamas then told Plaintiff that she could not clock in time when she was not, in fact, working, at which point Plaintiff asked Malamas to delete her 7:51 A.M. clock in. (*Id*. ¶ 111.)

After Malamas informed Levins of these discrepancies, Levins sent an email to Malamas, Roeber, and Burgos expressing her concern that Plaintiff's API activity was not consistent with the work product she was producing. (*Id*. ¶ 117.) As a result, on September 25, 2019, Malamas and Burgos met with Plaintiff to inform her of her suspension and offer the Plaintiff to explain the inconsistencies existing between Plaintiff's logged hours versus productive hours. (*Id*. ¶ 119.) Plaintiff was placed on suspension pending investigation, rather than first receiving a verbal or written warning because GHMC considered theft of time to be an "egregious offense." (*Id*. ¶ 120.) The decision to suspend Plaintiff prior to the meeting was made because there was sufficient information indicating discrepancies in Plaintiff's logged hours versus productive hours. (*Id*. ¶ 124.) Indeed, during the meeting, Plaintiff admitted that during the course of the investigation Burgos and Malamas might discover other instances where Plaintiff's logged hours would not match her productive hours. (*Id*. ¶ 128.) Plaintiff denied stealing time, but instead stated that she was in fact working, just not during the times logged into API. (*Id*. ¶ 130.)

Subsequent to the suspension meeting, GHMC conducted a full investigation into Plaintiff's work activity. (*Id*. ¶ 134.) Specifically, Levins compared the times that Plaintiff was clocked into API against Plaintiff's work done in EPIC, the primary system used by coders, or Chartwise and created a chart of this information. (*Id*. ¶¶ 136, 138.) The investigation reviewed all aspects of possible productive hours Plaintiff could have worked. (*Id*. ¶ 137.) Any work done by Plaintiff within EPIC or Chartwise was reviewed within the investigation. (*Id*. ¶¶ 138-140.)

Plaintiff's work done on EPIC would be captured even if Plaintiff did not clock in. (*Id*. ¶ 141.) The comparison chart produced by Levins found that between September 1 and September 23, 2019, Plaintiff was clocked in for 39 hours that were not represented in EPIC or any other work platform reports. (*Id*. ¶ 142.) The comparison chart further found that there were only two occasions, totaling one hour, that Plaintiff worked in EPIC but was not captured by API. (*Id*. ¶ 143.) Accordingly, Plaintiff was paid for 39 hours she did not work. (*Id*. ¶ 144.) With Plaintiff's theft of time substantiated, GHMC terminated Plaintiff's employment.

Based on the foregoing, Plaintiff's brings claims alleging violations of Title VII and Section 1981.

## PROCEDURAL HISTORY

On October 13, 2021, Plaintiff commenced this action against the Defendants in her Complaint ("Compl."). (ECF No. 1.) On July 2, 2024, Defendants filed their Motion for Summary Judgment, along with their memorandum of law in support ("Motion" or "Mot.") and their Rule 56.1 statement. Plaintiff chose to submit neither an opposition to Defendants' motion, nor a motion for summary judgment of her own, nor a Rule 56.1 statement or counterstatement.

## LEGAL STANDARD

### A.  Rule 56

Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)") provides in relevant part, that a case is properly dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. When resolving a Rule 12(b)(1) motion for lack of lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings. *See Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986). Plaintiff bears the burden

of demonstrating by a preponderance of the evidence that subject matter jurisdiction exists. *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996).

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, including depositions, documents, affidavits, or declarations "which it believes demonstrate[s] the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). To oppose summary judgment, "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (holding the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013). Courts must

"draw all rational inferences in the non-movant's favor" when reviewing the record. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson*, 477 U.S. at 248). Importantly, "the judge's function is not [ ] to weigh the evidence and determine the truth of the matter" or determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. A court should grant summary judgment when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

When an adverse party does not respond to a motion for summary judgment, summary judgment should only be granted if appropriate. *See United States Liab. Ins. Co. v. P. Mahoney Contracting Corp.*, No. 95-CV-9108(MGC), 1998 WL 895750, at *1 (S.D.N.Y. Dec. 21, 1998) (even when summary judgment motion is unopposed, "judgment should not be granted in circumstances contrary to law"). "Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 242 (2d Cir. 2004).

 "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied <u>even if no opposing evidentiary matter is presented</u>.'" *Id.* (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001)) (emphasis in original).

## DISCUSSION

Plaintiff brings claims pursuant to Title VII and Section 1981. The Court addresses them in turn.

**A. Title VII Claims**

   a.  **Whether Plaintiff's Title VII Claims are Time Barred**

To bring a Title VII discrimination claim, a plaintiff must establish that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)).

Where a plaintiff has so established a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). At that point, the burden shifts to the employer "'to articulate some legitimate, nondiscriminatory reason' for the disparate treatment.'" *Id.* (quoting *McDonnell Douglas,* 411 U.S. at 802). Then, the burden shifts back to the plaintiff to prove the employer's proffered reason was pretext for discrimination. *Id.* Additionally, a Plaintiff must file a charge with the Equal Employment Opportunity Commission within 300 days of the alleged unlawful practice. *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 133 (2d Cir. 2003). Failure to do so renders the Title VII claim time barred. *Atherley v. New York City Dep't of Educ.*, 2024 WL 1345741, *8 (S.D.N.Y. Mar. 29, 2024); *Alveari v. Am. Int'l Grp., Inc.*, 590 F. Supp. 228, 230 (S.D.N.Y. 1984).

According to the New York State Division of Human Rights complaint, Plaintiff asserts the most recent unlawful practice occurred October 21, 2019. (JAS Aff., Ex. 34., p. 3.) Additionally, Plaintiff filed her NYSDHR Complaint on October 19, 2020. Defendants attempt to argue that Plaintiff's claims are thereby time barred since the NYSDHR Complaint "relies *solely* on events that occurred <u>more </u>than 300 days before the October 19, 2020." (Mot., p. 3.) Defendants reason

that the relevant standard is that "[d]iscrimination and retaliation claims under Title VII must be filed with an administrative agency within 300 days of the alleged discriminatory act to be timely." (*Id.*) This paints the relevant standard with too broad of a brush; the Supreme Court has held that "[i]n a State having an entity authorized to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice . . . The requirement, therefore . . . means that a litigant has up to . . . 300 days after the unlawful practice happened to file with the EEOC." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 102 (2002).

Neither the Plaintiff nor the Defendants have provided the Court with a copy of Plaintiff's charge filed with the EEOC. The Defendants have provided the Court with a copy of Plaintiff's Notice of Right to Sue from the EEOC dated June 24, 2021. (JAS Aff., Ex. 36.) However, this document is unhelpful as it does not clarify when exactly Plaintiff's charge was filed and therefore does not clarify whether the discriminatory conduct complained of is time barred. "On a motion for summary judgment, '[a]s a general rule, all ambiguities and references to be drawn from the underlying facts should be resolved in favor of the party opposing the motion.'" *Riedinger v. D'Amicantino*, 974 F. Supp. 322 (S.D.N.Y. 1997) (quoting *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988)). Therefore, the Court cannot find that Plaintiff's Title VII claims are time barred and proceeds to address them on their merits.

     b. **Race and Religion Discrimination Claims**

In support of her claims for discrimination under Title VII, Plaintiff points to four moments: (1) her switch to per diem status; (2) denying Plaintiff retroactive pay; (3) her suspension pending investigation; and (4) her ultimate termination.

Before analyzing each of the relevant prongs for a Title VII discrimination claim, the Court notes that Plaintiff's switch to per-diem status and the denial of retroactive pay were not adverse

employment actions for the purposes of a Title VII analysis. A plaintiff "sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 576 (S.D.N.Y. 2011). A materially adverse change is a change in working conditions that is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id*. (quoting *Galabya v. N.Y. City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)). "Examples of a materially adverse change include the 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Id*.

Under such standards, neither Plaintiff's switch to per diem status nor the denial of retroactive pay can be found to be adverse employment actions. Regarding the former, contrary to being an adverse change in Plaintiff's working conditions, Plaintiff's switch to per diem status was a voluntary decision and an accommodation tailored to Plaintiff's time off requests totaling 29 days of unpaid time off. (Defs' 56.1 ¶¶ 43-52; *see also* JAS Aff., Ex. 11). Indeed, Plaintiff acknowledged as much when, after electing to switch to per diem status, Plaintiff wrote to Burgos, Tyiska, Roeber and Carberry regarding her decision, stating:

> "Thank you all again for working with me. After having all questions answered, and after discussing with Monica, I have my decision available. Monica has been and is very helpful in assuring me that this will work out for the best! I really appreciate and will accept the option of working per diem, as this will allow me to celebrate my religious holidays and be with my family when I need/want to, without sacrificing my job. All 3 are important to me, so it seems like this will bring it all together for me. I do realize that I'm giving up all my benefits, the only benefit I will having is being paid on Holidays . . . Thanks again, it is a pleasure working with you!" (JAS Aff., Ex. 12.)

By Plaintiff's own words, she reached her own voluntary decision after weighing the costs and benefits of each of the options presented to her; she cannot now seek to recharacterize a voluntary choice (a choice based on Plaintiff's email that she appeared to be enthusiastic about

and grateful for) as an adverse employment action simply because she wishes to bring forward a Title VII claim. Thus, Plaintiff's switch to per diem status and its corresponding implications, where voluntarily chosen by Plaintiff, do not constitute an adverse employment action that can serve as the basis for a viable Title VII claim.

As to the latter, Plaintiff not receiving retroactive payment is likewise not an adverse employment action. While a salary decrease would constitute an adverse employment action per *Bermudez*, here Plaintiff is not stating she experienced a salary decrease, but rather that she was not given retroactive payment after she was given a salary increase. Such reasoning is akin to *Bansal v. City of New York*, 2020 WL 13659112 (E.D.N.Y. Feb. 24, 2020), wherein the court granted summary judgment in favor of the defendant against plaintiffs' claim of Title VII discrimination. Therein, the plaintiffs claimed they experienced adverse employment action when the defendants denied their request for a salary increase; however, the court rejected this argument, noting that plaintiffs "failed to demonstrate that they were entitled to an increase in their salaries as a matter of course." *Id*. at *9. Here, Plaintiff does not demonstrate that she was entitled to retroactive payment in accordance with her salary increase or as a matter of course. (Defs' 56.1 ¶¶ 74-75, 83-86.) Accordingly, Plaintiff not receiving retroactive payment, where Plaintiff does not demonstrate she was entitled to such renumeration, cannot constitute adverse employment action for the purposes of stating a Title VII claim. *See Wilkinson v. New York State*, 2019 WL 5423573 (E.D.N.Y. Oct. 22, 2019); *see also  Boyar v. City of New York*, 2010 WL 4345737 (S.D.N.Y. Oct. 28, 2010).

Turning now to the Title VII analysis, Plaintiff is able to satisfy the first three prongs: Plaintiff is a member of a protected class (prong 1) (JAS Aff., Ex. 37 ¶¶ 8, 12); Plaintiff is qualified for the position (prong 2) (Defs' 56.1 ¶¶ 69-71); and she suffered adverse employment actions,

namely being suspended pending investigation and her employment being terminated (prong 3) (*Id*. ¶¶ 119, 149). Where Plaintiff claims fall short is the fourth prong, demonstrating that such action occurred in circumstances which give rise to an inference of discrimination.

To restate the relevant facts, the decision to suspend Plaintiff pending investigation was made after Malamas, as part of her routine as Plaintiff's supervisor, ran an afternoon productivity report on September 19, 2019. (*Id*. ¶¶ 94-95). As a result, Malamas discerned that while Plaintiff had punched into API for seven hours, Plaintiff did not complete any charts during that time. (*Id*. ¶¶ 95, 106.) The following day, Malamas again reviewed Plaintiff's API activity for September 19, 2019, and still was unable to account for Plaintiff's work. (*Id*. ¶ 106.) Thereafter, on September 23, 2019, Plaintiff was found to have clocked in at 7:51 A.M. but was not active on any accounts and was shown as away on Jabber. (*Id*. ¶ 109.) When Malamas called Plaintiff to inquire as to what she was working on, Plaintiff conceded that "she was not working yet but had clocked in already so she could make her hours for the day without going past 6:00 P.M." (*Id*. ¶ 110.) Malamas told Plaintiff she could not be clocked in when she was not, in fact, working. (*Id*. ¶ 111.) Plaintiff then asked Malamas to delete her 7:51 A.M. clock in. (*Id*.) As a result of Plaintiff's conduct, Malamas contacted Levins, who then arranged for a meeting with Plaintiff wherein she was suspended pending investigation into the discrepancy in the time she purportedly worked and the work product she actually furnished. (*Id*. ¶ 115-117).

The decision to terminate Plaintiff was made after GHMC's investigation into the discrepancy between Plaintiff's logged hours versus productive hours substantiated that Plaintiff had engaged in time theft. (*Id*. ¶ 149.) Specifically, the investigation revealed that while Plaintiff represented that she worked – and was compensated for – 82.75 hours of work for the first two

weeks of September, she did not work for 39 of those hours. (*Id.*; *see also* JAS Aff., Exs. 27, 28; Levins Dep. at 210:12-21).

Summary judgment must be granted in favor of the Defendants on Plaintiff's Title VII race and religion discrimination claims predicated on these adverse employment actions. While suspension and termination are both recognized forms of adverse employment action, Plaintiff does not offer a legal basis that would justify finding such action occurred in circumstances that would give rise to an inference of discrimination. To the contrary, as the above facts and the record generally demonstrate, Defendants' suspension of and termination of Plaintiff were entirely predicated on concerns of time theft that were ultimately substantiated and which Plaintiff, through the present, has not offered a substantive legal argument for the Court to view in any other way but an employer investigating, suspending and terminating an employee found to be engaging in time theft. (*See* Defs' 56.1 ¶¶ 105, 128, 149; *see also* JAS Aff., Exs. 25, 26, 45, 46.)

The closest Plaintiff gets to satisfying this standard is when she states that Levins or someone from the Human Resources department stated to her, regarding managing her work schedule and Jewish holidays, "the Muslims can make it work, why can't you?" (Defs' 56.1 ¶ 62.) However, without anything further in the record, this cannot support an inference of discrimination as "[i]t is well established that 'the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination.'" *Lopez v. White Plains Hosp.,* 2022 WL 1004188 (S.D.N.Y. Mar. 30, 2022), *aff'd,* 2022 WL 19835765 (2d Cir. May 16, 2022) (quoting *Hasemann v. United Parcel Serv. of Am., Inc.*, 2013 WL 696424, at *6 (D. Conn. Feb. 26, 2013)).

Ultimately, Plaintiff leaves the Court with no basis in the record to find an inference of discrimination except her belief that she was discriminated against. This is simply insufficient. *See Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 390 (S.D.N.Y. 2016) (finding that

"bare suspicions of discrimination in the absence of any supporting evidence will not suffice" to survive summary judgment); *Mixon v. Buffalo Med. Grp., P.C*, 2013 WL 597594, at *6 (W.D.N.Y. Jan. 28, 2013) ("Feelings [of discrimination] are not evidence." (alteration in original) (citation omitted)), report and recommendation adopted, 2013 WL 593985 (W.D.N.Y. Feb. 15, 2013); *Sibilla v. Follett Corp*., 2012 WL 1077655, at *8 (E.D.N.Y. Mar. 30, 2012) (noting that "an employee's feelings and perceptions of being discriminated against are not evidence of discrimination" (citing *Bickerstaff v. Vassar Coll*., 196 F.3d 435, 456 (2d Cir. 1999))); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) ("Speculation, conjecture[,] and guess-work cannot substitute for actual evidence of discrimination."); *Williams v. All. Nat'l Inc*., 2001 WL 274107, at *5 (S.D.N.Y. Mar. 19, 2001) (noting that a plaintiff's "beliefs cannot replace the 'admissible evidence' required to permit an inference of discrimination and survive summary judgment"), *aff'd*, 24 F. App'x 50 (2d Cir. 2001).

Therefore, summary judgment is appropriate in favor of the Defendants as there is no genuine dispute of material fact regarding whether Plaintiff's suspension and termination occurred in circumstances that do not give rise to an inference of discrimination, and as the record indicates that Plaintiff's Title VII religion and race-based discrimination claims fail as a matter of law. Accordingly, the Court grants summary judgment in favor of the Defendants as to Plaintiff's Title VII religion and race-based discrimination claims and dismisses said claims with prejudice.

c.  **Retaliation Claim**

To state a *prima facie* case of retaliatory discrimination, "a plaintiff must demonstrate by a preponderance of the evidence: 'i) participation in a protected activity known to the defendant; ii) an employment action disadvantaging the plaintiff; and iii) a causal connection between the protected activity and the adverse employment action." *Riedinger v. D'Amicantino*, 974 F. Supp.

322 (S.D.N.Y. 1997) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995)). The point at which Plaintiff establishes a *prima facie* case, the burden shifts to the defendant who "'must demonstrate legitimate reasons for [their] actions, whereupon the plaintiff bears the burden of showing that the defendant['s] explanation are pretext for the true discriminatory motive.'" *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996)). Important context is that a causal connection can be established through such indirect evidence of close proximity in time. *Id.* at 329; *see Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996); *see also Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980).

What exactly constitutes "protected activity" has been addressed by the Second Circuit. Protected activity "generally involves the filing of a formal complaint of discrimination with an administrative agency," however, "the Second Circuit has recognized that 'protected activity' includes 'informal protests of discriminatory employment practices, including making complaints to management.'" *Risco v. McHugh,* 868 F. Supp. 2d 75 (S.D.N.Y. 2012) (quoting *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990)). However, "such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII. Generalized complaints about a supervisor's treatment are insufficient." *Id.* at 112. *See Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 108 (2d Cir.2011) ("Rojas II") (affirming district court's holding that plaintiff failed to state a prima facie case of retaliation because a mere generalized complaint was not protected activity).

Within the record, there are only two colorable instances that could be construed as qualifying as protected activity for the purposes of a Title VII retaliation claim: 1) Plaintiff's complaint of discrimination in 2017 against Tyiska; 2) Plaintiff's threatening to file a complaint with the New York State Department of Labor on August 9, 2019. As to the former, in 2017,

Plaintiff complained to Roeber about Tyiska, alleging that Tyiska was discriminating against Plaintiff on the basis of her religion in that Tyiska was trying to demote Plaintiff by not allowing her to work remotely. (Defs' 56.1 ¶ 64-65.) While such complaints could be understood as protected activity, Plaintiff acknowledged in her deposition that such complaints were stemming from a "separate incident" not relating to the present case." (*Id*. ¶ 68; *see also* Pl. Dep. at 141:10-18.) Therefore, even if this was protected activity, this would not be protected activity for the instant action as Plaintiff concedes such activity is not pertinent to the instant action. (*Id*.)

As to the latter, Plaintiff threatened to file a complaint with the New York State Department of Labor because of GHMC's denial of retroactive pay on August 9, 2019. While such an act could be characterized as protected activity, where Plaintiff falls short is that Plaintiff's threatened complaint did not make clear that Plaintiff was protesting discrimination against any protected characteristics. As discussed *supra*, a claimant's protests "must be sufficiently specific to make it clear that employee is complaining about conduct prohibited by Title VII." *Risco v. McHugh*, 868 F. Supp. 2d 75 at 111. Here, the record only shows that Plaintiff stated, in response to learning that she would not receive retroactive payment for a pay increase, "I may file a complaint with nys dept of labor." (JAS Aff., Ex. 43.) Such language is demonstrably lacking; it in no way would suggest that Plaintiff is opposing any conduct prohibited by Title VII, and instead just suggests that Plaintiff will file a complaint with an administrative agency in response to the denial of retroactive payment. Therefore, per *Risco*, Plaintiff's threatened complaint is insufficient to serve as the basis of a Title VII retaliation claim. As the record contains no other facts that would support the contention that Plaintiff engaged in protected activity and the record does not establish a genuine dispute of material fact as to whether Plaintiff engaged in protected activity and as the record indicates that Plaintiff's Title VII retaliation claim fails as a matter of law, summary

judgment must be granted in favor of the Defendants as to Plaintiff's Title VII retaliation claim, and the Court therefore dismisses said claim with prejudice.

>    d.    **Failure to Exhaust Administrative Remedies as to Plaintiff's Title VII National Origin Claims**

In order to bring a Title VII claim, a plaintiff must exhaust their administrative remedies. Before bringing a Title VII suit in federal court, an "individual must first represent 'the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency.'" *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.,* 458 F.3d 67, 69 (2d Cir.2006)). The "'purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate, and take remedial action.'" *Fowlkes v. Ironworkers Loc. 40*, 790 F.3d 378 (2d Cir. 2015) (quoting *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 712 (2d Cir.1998)). This exhaustion requirement "applies to *pro se* and counseled plaintiffs alike." *Id*. The requirement to exhaust administrative remedies "is not a *jurisdictional* requirement; rather, it is merely a precondition of suit, and, accordingly it is subject to equitable defenses." *Id*. (emphasis in original).

Where a plaintiff fails to first bring a claim she raises under Title VII before the underlying administrative agency, a court may still be empowered to consider the claim as though it were properly raised before the administrative agency if it is "reasonably related" to the claim filed with the agency. *Littlejohn*, 795 F.3d 297 at 322. Whether a claim is "reasonably related" to the claim filed with the agency is "if the conduct complained of would fall within the scope of the EEOC [or agency] investigation which can reasonably be expected to grow out of the charge [or complaint] that was made." *Id*. (quoting *Deravin v. Kerik,* 335 F.3d 195, 200-201 (2d Cir.2003)). This turns on whether the factual allegations might suggest more than one form of discrimination, even if

only one is decried, such that the agency receives "adequate notice to investigate discrimination on both bases." *Id*. at 202.

The Second Circuit has cautioned that "courts should not attempt to draw overly fine distinctions between race and national origin claims . . . given the potential overlap between the two forms of discrimination." *Deravin,* 335 F.3d 195 at 203. For example, courts have found that administrative agencies could be reasonably expected to "investigate both racial and national origin bias when a complaintaint claim[ed] to have been discriminated against because he is an Asian Indian," as such language is suggestive of not only race but also national origin. *Dixit v. City of New York Dep't of Gen. Servs.*, 972 F. Supp. 730, 735 (S.D.N.Y. 1997).

Here, Plaintiff seeks to bring a claim for discrimination based on national origin under Title VII. Before the NYSDHR, Plaintiff only asserted discrimination based on "creed/religion" and "race/color or ethnicity." (JAS Aff., Ex. 34, p. 2.) Plaintiff's complaint to the NYSDHR do not include any substantive averments that would suggest that she was protesting discrimination on the basis of national origin, and notably, Plaintiff chose to not select "national origin" as one of the alleged bases of discrimination. (*Id*.) Plaintiff's NYSDHR complaint states that she was terminated "for being an orthodox Jewish woman." (*Id*.) Without any further factual averments, the NYSDHR [and her former employer] could not have been on notice to investigate claims for discrimination based on national origin. *Id*.; *cf Dixit*, 972 F. Supp. 730.

Based on the record before the Court, the Court cannot find there to be a genuine dispute of material fact as to whether Plaintiff's national origin-based discrimination claim is reasonably related to Plaintiff's religion and race-based discrimination claims, such that she can be found to have properly exhausted her administrative remedies and finds that Plaintiff's claim of national origin-based discrimination fails as a matter of law. Therefore, the Court must dismiss Plaintiff's

Title VII national origin discrimination claim with prejudice and grant summary judgment in favor of the Defendants.

### B. Collateral Estoppel of Plaintiff's Section 1981 Claims by NYSDHR Determination

Regarding claims under Section 1981, the Supreme Court has held that "when a state agency 'acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts*." University of Tennessee v. Elliott,* 478 U.S. 788, 799 (1986) *(*quoting *United States v. Utah Contr. & Min. Co., 384 U.S. 394, 422 (1966), superseded by statute on other grounds*); *see also Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 728 (2d Cir.2001).

In New York courts, a state agency determination will collaterally estop a plaintiff from subsequently bringing suit if there is "'identity of issue which has been necessarily been decided in the prior action and is dispositive of the present action,' and the party to be estopped . . . had a 'full and fair opportunity to contest the decision now said to be controlling.'" *Johnson v. Cnty. of Nassau*, 411 F. Supp. 2d 171 (E.D.N.Y. 2006) (quoting *Kosakow*). Additionally, "[t]he proponent of preclusion bears the burden of proving identity of issue, while the adverse party bears the burden of proving that he lacked a full and fair opportunity to litigate the issue.'" *Id*.

Identity of issue exists where the plaintiff brings the same claim in a subsequent action as they did at a state agency. *Harper v. Nat'l Kidney Found., Inc.*, 2005 WL 43774, *3 (W.D.N.Y. Jan. 10, 2005); *see also Janneh v. Regal Ent. Grp*., 2007 WL 2292981 (N.D.N.Y. Aug. 6, 2007) (same); *Saunders v. New York Convention Ctr. Operating Corp*., 2021 WL 4340793, *12 (S.D.N.Y. Sept. 23, 2021). Furthermore "[i]n considering whether a party has had a full and fair opportunity to litigate claims, courts should consider 'the various elements which make up the realities of

litigation,' including 'the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.'" *Id*. (quoting *Kosakow*). Additionally, "if the prior proceeding was not before a court, but before an administrative agency such as the NYSDHR, courts should consider 'whether the procedures used in the administrative proceeding assured that the information presented to the agency were sufficient both quantitatively and qualitatively, so as to permit confidence that the facts were adequately tested and that the issue was fully aired.'" *Id*. (quoting *Kosakow*).

Here, Plaintiff brought claims before the NYSDHR, specifically alleging discrimination on account of her being an Orthodox Hasidic Jewish person, and retaliation in response to her protesting discrimination to her supervisors and the Human Resources department of her job. (JAS Aff., Ex. 34, p. 4.) Plaintiff's complaint in the instant action likewise brings claims under Section 1981, alleging discrimination and retaliation. (Compl. ¶¶ 37-46.) Thus, the Defendants are able to demonstrate identicality of issues between Plaintiff's NYSDHR claims and Plaintiff's claims brought in the instant action. *Harper*, 2005 WL 43774 at *3; *see also Saunders*, 2021 WL 4340793 at *12.

As to whether the Plaintiff had a full and fair opportunity to litigate in the underlying administrative proceeding before the NYSDHR, Plaintiff offers no legal basis to demonstrate that she lacked a full and fair opportunity to litigate her claims. Plaintiff, during the NYSDHR proceeding, submitted 72 pages of documentation in support of her complaint (JAS Aff., Ex. 34), and the NYSDHR Determination states that "[a]fter investigation, and following opportunity for review of related information and evidence by the named parties" it reached its conclusion of no

probable cause as to Plaintiff's claims of discrimination and retaliation. (JAS Aff., Ex. 35.) Likewise, Plaintiff has not identified new evidence that would support her claims, and there is no indication that the "determination made by the NYSDHR was a 'compromise verdict.'" *Johnson*, 411 F. Supp. 2d 171 at 181 (E.D.N.Y. 2006). Furthermore, there are not significant differences in the applicable law; to the contrary, "retaliation claims under the NYSHRL are treated as the same as retaliation claims under . . . Section 1981." *Bermudez,* 783 F. Supp. 2d 560 at 577. Employment discrimination claims arising NYSHRL are similarly analyzed under the same framework as employment discrimination claims arising under Section 1981. *Alvarado v. United Hospice, Inc*., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022).

While the record is unclear as to whether Plaintiff was represented during the NYSDHR proceedings, Plaintiff has "identified no facts suggesting that during the administrative process, [s]he lacked a full and fair opportunity to litigate h[er] claims." *Hendrix v. Pactiv LLC*, 488 F. Supp. 3d 43 (W.D.N.Y. 2020). Indeed, Plaintiff has not offered any argument whatsoever addressing any of the above-mentioned factors. Thus, while some factors such as whether Plaintiff had legal representation remain unclear or might counsel against application of collateral estoppel, the weight of the factors, coupled with Plaintiff's decision to not provide any legal basis as to why she should not be found to have had an opportunity to fully and fairly litigate, lead to the inevitable conclusion collateral estoppel bars Plaintiff's Section 1981 claims. Accordingly, the Court grants summary judgment in favor of the Defendants and dismisses Plaintiff's Section 1981 claims with prejudice as, based on the facts presented in the record, there is no genuine dispute of material fact as to whether Plaintiff lacked a full and fair opportunity to litigate her claims before the NYSDHR, and that Plaintiff's Section 1981 claims fail as a matter of law by way of collateral estoppel.

## CONCLUSION

For the foregoing reasons, Defendants Greater Hudson Valley System (n/k/a Garnet Health), Orange Regional Medical Center, and Erica Burgos' motion for summary judgment is GRANTED. The Clerk of Court is kindly directed to terminate the motion at ECF No. 64. The Clerk of Court is also directed to enter judgment in favor of the Defendants. The Clerk of Court is further directed to close the case.

Dated:    December 13, 2024                     SO ORDERED:
        White Plains, New York

_____
      NELSON S. ROMÁN
    United States District Judge